John M. PREWITT, Appellant,

v.

Paul R. SEXTON and Mary Katherine
Ratliff, Appellees.

No. 88–SC–618–DG.

Supreme Court of Kentucky.

Sept. 28, 1989.

John M. Prewitt, Mt. Sterling, pro se.
William K. Moore, Midway, for appellees.

LEIBSON, Justice.

The appellant, John M. Prewitt, is a practicing attorney with offices in Mt. Sterling, Kentucky, who undertook representation on a "pro bono" basis of Donna Willoughby, mother of a nine month old daughter, who told him her baby had been taken, without notice, by a welfare worker accompanied by a peace officer, from the care of a woman tending the baby while the mother was behind the house working in the garden. She asked Attorney Prewitt's help because she wanted her baby back. The appellees, Paul R. Sexton and Mary Katherine Ratliff, were social workers in the Bath County office of the Department of Social Services, involved in handling this case.

There were a number of circumstances in the story related to Prewitt by Donna Willoughby that suggested the possibility that the baby had been taken from the mother unlawfully, and was being withheld by "the Bath County welfare people" contrary to law. Attorney Prewitt was advised by the mother she never received any "court papers" from the Sheriff or otherwise, and there was no order signed by a judge to establish a legal basis for the child having been taken and withheld. She had been to a court conference presided over by Judge James Clay of Morehead, sitting in Bath County, but she had been summoned there by a telephone call from the welfare worker.

In an effort to investigate the legal circumstances under which the child was being withheld, Attorney Prewitt sent first his client, and then he went in person, to the Bath County Circuit/District Clerk's office in Owingsville to see the file. Both the client and later on the attorney, when they went to the Clerk's office, were denied access to the file. They were told the file was "confidential", but they also were told there was nothing in the file signed by Judge Clay. Also, Attorney Prewitt was told that he could not see the file without a *written* order from Judge Clay, which, if it could be obtained, would necessitate going on from Owingsville to Morehead, the opposite direction from his office in Mt. Sterling.

Rather than trying to locate and obtain an audience with Judge Clay, Attorney Prewitt tried going over to the Bath County welfare office for information, but there he was told he would have to make an appointment and come back. His research convinced him there were no statutes mak-

ing these court records confidential from the child's mother or her attorney. Persuaded by this combination of circumstances—the court records were inaccessible, the Welfare Department frustrated his effort to investigate, both he and his client had been told there was nothing in the record signed by the Judge, and his client had not been served with summons before the baby was taken from her—Attorney Prewitt decided that the correct procedure was to institute habeas corpus proceedings under KRS 419.020 in Bath Circuit Court. Since he thought these circumstances suggested that the welfare workers involved had violated his client's constitutional rights, he added a claim for damages for violation of the Civil Rights Act, 42 U.S.C.A. § 1983. The named defendants were Ratliff, the case worker in charge of the Willoughby child's case, and Sexton, the field supervisor in charge of the office.

The attorney for the Welfare Department responded to the suit with a Motion to Dismiss, and brought to the hearing on the motion the piece of paper that Attorney Prewitt had been looking for when he attempted to investigate in the Circuit/District Clerk's office in Owingsville, i.e., the "Emergency Custody Order" from the Bath County District Court, Juvenile Division, authorizing the Bath County Sheriff Department to take physical custody of the child and place the child in the temporary custody of the Cabinet for Human Resources. This Order was signed by "John D. Hughes, T.C." This was a Trial Commissioner whose existence was unknown to Prewitt, with authority to issue such orders in Bath County in the absence of the District Judge. This Order provided the missing essentials. It both established that the child had been taken pursuant to court order and explained how and why Attorney Prewitt and his client were misled when told there were no orders in the file signed by the District Judge.

When the Emergency Custody Order was produced, Attorney Prewitt dismissed the habeas corpus/civil rights complaint *forthwith*. He then proceeded, and succeeded, to restore the baby to the custody of his client by Motion in the District Court to Set Aside the Temporary Custody Order. He got what he had sought by the habeas corpus action, which was to have the social workers produce the baby and, if they could not justify why the baby had been taken and was being withheld, deliver the child to the immediate possession of the mother.

Nevertheless, the social workers retaliated with the present action, filed against both Donna Willoughby, the mother, and John M. Prewitt, her attorney, charging "abuse of process," "malicious prosecution," and "intention[ally] inflicting severe mental and emotional distress." At trial of this action the appellants dropped the claims of abuse of process and intentionally inflicting emotional distress, and the case was submitted under the theory that Willoughby and Prewitt maliciously prosecuted the civil action seeking habeas corpus and damages under the Civil Rights Act.

The jury verdict exonerated Donna Willoughby, presumably under Instruction No. 14(a) which set up the defense of acting on the advice of counsel, but returned verdicts against Prewitt in favor of both Sexton and Ratliff, awarding each $2,500 in compensatory damages and $10,000 in addition as punitive damages, a total of $25,000.

The trial court overruled Prewitt's Motions for a New Trial and for Judgment Notwithstanding the Verdict, and the Court of Appeals affirmed. We have accepted discretionary review, and reverse.

■ Strictly speaking, this suit is improperly designated as a claim for "malicious prosecution." This is old terminology deriving from wrongful prosecution of criminal cases, a separate cause of action as described in *Restatement (Second) of Torts*, § 653–73 (1977). Properly designated, this tort is the "wrongful use of civil proceedings," the elements of which are described in the *Restatement (Second) of Torts*, §§ 674–681B. We have recently clarified and explained the basis for this cause of action in *Mapother & Mapother, P.S.C. v. Douglas*, Ky., 750 S.W.2d 430, 431 (1988):

"[I]n this type of action, the law is set out in Restatement (Second) of Torts, § 674–76 (1977). These sections are found under the general heading of Chapter 30, entitled 'Wrongful Use of Civil Proceedings.' We would note in passing that this is a more accurate categorization than 'malicious prosecution' as utilized in *Hill v. Willmott,* [Ky.App., 561 S.W.2d 331 (1978) ], and any reliance upon the dicta in that case where a civil action is involved is misplaced."

This suit represents a relatively new type of litigation, often designated generically as "countersuits," seeking retribution against attorneys on behalf of litigants who believe they have been victimized by a groundless lawsuit. Prewitt claims he was entitled to a directed verdict. The questions are what elements of proof are necessary to establish a countersuit for which a lawyer must respond in damages, and was there sufficient evidence against this appellant to establish such a cause of action.

Borrowing terminology from older cases discussing the concept of malicious prosecution has confused the issue. We turn, instead, to the discussion of the key elements of Wrongful Use of Civil Proceedings in Chapter 30, *Restatement (Second) of Torts,* which we approved in *Mapother & Mapother, P.S.C. v. Douglas, supra.* The elements which have caused difficulty are (1) lack of probable cause, (2) improper purpose, and (3) what type of injury is compensable. This cause of action requires that in the prior lawsuit the tortfeasor acted "without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the [prior] claim." *Restatement (Second) of Torts* § 674. Recovery is limited to specified harm (*Id.,* § 681), and the judge must decide whether "the harm suffered by the plaintiff is a proper element for the jury to consider in assessing damages." *Id.,* § 681B(1)(d).

■ Understanding begins by appreciating that lack of probable cause and improper purpose are separate and distinct elements, separate *both* as to their *meaning*

and as to their *function,* i.e., the role they play in the decision-making process.

■ First, as to their meaning. "Probable cause" is a legal concept with origins in the judicial decision as to whether there was probable cause to issue a warrant, and as such its existence is a question for the *court* to decide. *Id.,* § 681B(1). It covers both a mistake of law and a mistake of fact, and it exists where the person who initiates civil proceedings "reasonably believes in the existence of the facts upon which the claim is based, and ... that under those facts the claim may be valid under the applicable law." *Id.,* § 675.

■ The second of these two essential prongs is an improper purpose, which is for the jury to decide *after* the court has determined that under the law and the facts the prior action was initiated or pursued without probable cause. *Id.,* § 681B(2). What is often loosely labeled proof of "malice" is more specifically defined in the *Restatement* as bringing the prior lawsuit "primarily for a purpose other than that of securing the proper adjudication of the claim." *Id.,* § 676. Verbiage borrowed from criminal cases prosecuted where there was no probable cause, to the effect that malice may be inferred from lack of probable cause, is not appropriate to jury instructions in civil cases because probable cause to initiate a civil action does not require "the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings." *See Restatement (Second) of Torts* § 675, Comment d, p. 459 *"Points of Difference Between Criminal and Civil Proceedings."*

The development of the concept of countersuits as the "remedy for unjustified litigation" is traced in *Prosser and Keeton on Torts,* 5th ed., § 120 (1984):

"The action of malicious prosecution, which began as a remedy for unjustifiable criminal proceedings, has been undergoing a slow process of extension into the field of the wrongful initiation of civil suits."

In Kentucky the law on this subject has pursued an uneven path from its origins in

the "doctrine of malicious prosecution," through its transition to civil proceedings, first against the persons who initiated prior civil proceedings, and then against their lawyers in cases such as *Rose v. Davis*, 288 Ky. 674, 157 S.W.2d 284 (1941), *Hill v. Willmott*, Ky.App., 561 S.W.2d 331 (1978), *Raine v. Drasin*, Ky., 621 S.W.2d 895 (1981), and finally, *Mapother & Mapother, P.S.C. v. Douglas*, Ky., 750 S.W.2d 430 (1988).

Traced through its course in Kentucky cases, this concept must be viewed, candidly, as a tort in transition, finding ultimate repose in present form in *Mapother & Mapother, P.S.C. v. Douglas, supra*. In *Raine v. Drasin, supra*, our Court referred to the *Restatement (Second) of Torts* as authority; in *Mapother & Mapother, P.S.C. v. Douglas*, we adopted it as the law on this subject.

The *Restatement (Second) of Torts*, § 681B, summarizes the "Functions of Court and Jury" in an action for Wrongful Use of Civil Proceedings as follows:

"(1) In an action for wrongful civil proceedings, the court determines whether

(a) a civil proceeding has been initiated;

(b) the proceeding was terminated in favor of the plaintiff;

(c) the defendant had probable cause for his action;

(d) the harm suffered by the plaintiff is a proper element for the jury to consider in assessing damages."

(2) In an action for wrongful civil proceedings, subject to the control of the court, the jury determines

(a) the circumstances under which the proceedings were initiated in so far as may be necessary to enable the court to determine whether the defendant had probable cause for initiating them;

(b) whether the defendant acted primarily for a purpose other than that of securing the proper adjudication of the claim on which the proceeding was based;

(c) the circumstances under which the proceedings were terminated;

(d) the amount that the plaintiff is entitled to recover as general and special damages;

(e) whether punitive damages are to be awarded, and if so, in what amount."

Other important baggage for this relatively new tort, the countersuit, brought along from its origins as response to a criminal warrant taken out with lack of probable cause, is thus described in *Raine v. Drasin, supra:*

"Historically, it [this tort] has not been favored in the law. *Lexington Cab Co. v. Terrell*, 282 Ky. 70, 137 S.W.2d 721 (1940). Public policy requires that all persons be able to freely resort to the courts for redress of a wrong, and the law should and does protect them when they commence a civil or criminal action in good faith and upon reasonable grounds. It is for this reason that one must strictly comply with the prerequisites of maintaining an action for malicious prosecution. *Davis v. Brady*, 218 Ky. 384, 291 S.W. 412 (1927)." 621 S.W.2d at 899.

■ It is only in circumstances where the trial court has decided that if certain facts exist they establish lack of probable cause, and the existence of such facts is in dispute, that there is a fact question for the jury to decide. 2 J. Palmore, *Kentucky Instructions to Juries* § 27.01–.03 (1989 ed.), comments on this subject as follows, p. 238:

"It is important to recognize that the existence of probable cause, *as such*, is not a jury question. Whether the facts supported by plaintiff's evidence amount to probable cause is a legal issue to be determined by the court. The question put to the jury is whether those facts which in the opinion of the trial court would constitute probable cause have been established by the evidence to the satisfaction of the jury." [Emphasis Original.]

It is important to note that the factual issues should be so stated that the burden is on the plaintiff to prove *lack of* probable cause, rather than the converse as stated above in Palmore. *Restatement (Second)*

*of Torts* § 681A. The person attacking the prior lawsuit as the wrongful use of civil proceedings is the plaintiff with the burden of proof.

In *Raine v. Drasin, supra,* the underlying facts in the prior medical negligence action were that a patient sustained a fractured shoulder while in an unconscious state undergoing treatment in a hospital emergency room. The issue was who was responsible for this fractured shoulder. The evidence that was key to establishing lack of probable cause was evidence that before filing suit the attorney "visited the hospital and reviewed its records which clearly showed that the fracture of the shoulder occurred before Drs. Drasin and Fadel were involved." 621 S.W.2d at 898. The significance of *Raine v. Drasin* on the subject of lack of probable cause lies in its factual predicate. Essentially, it held that where the uncontradicted facts showed it was clearly unreasonable for an attorney to believe there was a tenable basis for pursuing a lawsuit, this proved lack of probable cause. Since these facts were not in dispute, the court should have decided that the prior lawsuit was filed by the attorney without probable cause. Given these circumstances, the jury verdict that there was lack of probable cause was not reversible error.

█ In the present case we have the opposite situation. There was no evidence to show that Attorney Prewitt failed to make a reasonable effort to investigate the basis of his client's claim before filing suit. He claimed that the baby had been taken from his client without court order. He was either intentionally or inadvertently misled to believe such was the case. The question of probable cause is related not to whether the facts exist to prove a lawsuit, but whether it was reasonable to believe that the client's claim is tenable. In the context of probable cause, tenable "depends not on the actual state of the case in point of fact, but upon the honest belief of the person instituting it. It may flow from a belief that turns out to be unfounded as long as it is not unreasonable." *Ammer-*

*man v. Newman,* 384 A.2d 637, 640 (D.C. 1978).

As otherwise stated in *Kassan v. Bledsoe,* 252 Cal.App.2d 810, 60 Cal.Rptr. 799, 803 (1967):

[T]he term 'probable cause' has been defined to be a suspicion founded upon circumstances sufficiently strong to warrant a reasonable person in the belief that the charge is true.

In the present case the uncontradicted evidence compels the conclusion that the belief held by appellee Prewitt, although it "turn[ed] out to be unfounded," was "not unreasonable." *Ammerman v. Newman, supra.*

The appellant had been told by his client that no summons had been served on her, which was true, and that, although she had been to a hearing before the judge, there was no court order from the judge depriving his client of custody of her baby. When he attempted to check the court file to confirm this information, he was denied access to the file but told by the Clerk that there was no order signed by the judge in the file. His testimony was that he was unaware that there was a Trial Commissioner, a person not a judge with power to sign such a custody order, which is uncontradicted and not unreasonable in the circumstances. Appellees argue that Prewitt should have gone on to Morehead to see the District Judge to seek written permission to look into the court file even though he had been told there was no order from a judge in the file. Further, appellees argue that Prewitt should have further pursued his efforts to talk to someone in the Welfare Office before filing a habeas corpus proceeding. But this is hindsight rather than foresight. Prewitt was under no legal requirement to go to Morehead to seek a written order for access to a file to which the law permitted him access, to investigate further the possibility of a court order when he had been misled to believe that there was no such order in the file. Contrary to the Court of Appeals' Opinion, the papers delivered to Prewitt by his client did not contain a copy of a court order, and that was what Prewitt was looking for.

■ Although proof that an attorney initiated civil proceedings when he was ignorant of the law and failed to research it would be evidence bearing on lack of probable cause, here it must be said that even if mistaken, Prewitt's views of the law were not arbitrary and unreasonable. If not correct, at the least he had viable arguments to support his position. A view of the law that is arguably correct cannot be the basis upon which to charge lack of probable cause. As with the attorney's understanding of facts, all that is required to establish probable cause is that the attorney's view of the law is a tenable position. The question of probable cause underlying the tort of wrongful use of civil proceedings does not turn on whether a court subsequently decides the attorney erred in his view of the law, any more than it turns on whether he was subsequently unable to prove his client's claims regarding the facts, so long as his views were tenable at the outset.

■ The appellees argue the significance of various statements by Prewitt during the course of his defense of this case which they claim proves malice on his part. The statements he made in defending himself in the present proceeding are not evidence of malice in the prior proceedings unless they rise to the level of a judicial admission, which is not the case. In the context of the tort which is the gravaman of this action, wrongful use of civil proceedings, malice in general is not the issue; the issue is whether the prior lawsuit was filed primarily for an improper purpose. As stated in *Restatement (Second) of Torts*, § 681B(2)(b), the jury must decide:

> "[W]hether the defendant acted primarily for a purpose other than that of securing the proper adjudication of the claim on which the proceeding was based[.]"

While evidence of Prewitt's attitude deriving from his past associations with the welfare system might have some bearing on whether Prewitt had acted primarily for an improper purpose, as that term is defined in the *Restatement (Second) of Torts*, his unfavorable opinion of the Welfare Department has no bearing on the threshold question of lack of probable cause, which it was the function of the court to decide.

In this case the trial court's *post-trial order* established that after erroneously submitting the issue of probable cause to the jury, *after* the case was over, the trial court then made a separate judicial finding that Prewitt lacked probable cause to file the underlying lawsuit. For the reasons previously stated, this decision, whenever it was made, was in error.

The decision of the Court of Appeals is reversed. The judgment of the trial court is set aside, and the case is dismissed.

STEPHENS, C.J., and COMBS, GANT, LAMBERT, LEIBSON and VANCE, JJ., concur.

LEIBSON, J., files a separate concurring opinion in which COMBS, J., joins.

WINTERSHEIMER, J., dissents by separate opinion.

LEIBSON, Justice, concurring.

There is another reason why the appellant, Prewitt, was entitled to a directed verdict. Historically, not every civil action instituted without probable cause was subject upon dismissal to a countersuit. Liability was confined to "exceptional cases in which special injury or grievance is found to exist," such as "civil actions which are recognized as quasi-criminal in character, or which involve an interference with the person, as in the case of proceedings in lunacy, contempt, bastardy, juvenile delinquency, arrest under civil process, or binding over to keep the peace." *Prosser and Keeton on Torts*, 5th ed., p. 890 (1984). *See Harter v. Lewis Stores*, Ky., 240 S.W.2d 86 (1951), cited in *Raine v. Drasin*, Ky., 621 S.W.2d 895 (1981). The concept of what constitutes "special injury" was expanded in *Raine v. Drasin, supra*, to include damage to the professional reputation of a physician arising out of a complaint charging medical malpractice. The question here is whether the harm alleged

by the appellees in the present lawsuit falls within the penumbra of *Raine v. Drasin.*

The answer to this question turns on whether the accusation in the allegedly unjustified prior civil proceedings carried with it "defamatory" implication. *Restatement (Second) of Torts,* § 681. *Raine v. Drasin* gives this term a broad interpretation as applied to the charge of medical malpractice against physicians, but their professional reputation is, perhaps, uniquely vulnerable. Certainly, not every occupation is such that the charge of negligence on a single occasion, or similar act civilly actionable but not necessarily morally reprehensible, is sufficient for the jury to conclude "reputation ... [has] been 'assailed.'" 621 S.W.2d at 900. We should not extend the concept of defamation in *Raine v. Drasin* to every case where a person has been sued, simply because the suit is based on an act occurring in the course of one's occupation.

The courts have fashioned other more appropriate relief against attorneys for the victims of a groundless lawsuit where they cannot prove a cause of action for the wrongful use of civil proceedings because they have not suffered from the kind of harm described in *Restatement (Second) of Torts,* § 681: specifically, a Rule 11 motion or a motion for appellate relief under our CR 73. Within the terms of these rules, a lawyer who initiates or pursues a groundless lawsuit is not free from penalty, nor is his victim left without appropriate remedy.

We should not extend the parameters of claims for damage to professional reputation so broadly as to include the allegations of this complaint against these appellees. As explained in *Restatement (Second) of Torts,* § 681, Comment c, p. 470:

"In the ordinary case, however, the civil proceedings are in no way defamatory to the person against whom they are brought unless the matters alleged as their basis are themselves defamatory.... In a word, the test is whether the defendant's pleadings are such that if not protected by the privilege of a litigant (see § 587) they would be action-able under the rules governing recovery for defamation."

The complaint filed by Prewitt on behalf of Willoughby against the appellees did not refer to their occupation and did not damage them in their reputation under "the rules governing recovery for defamation." *Id.*

COMBS, J., joins.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because there was sufficient evidence to support the decision of the jury and the opinion of the Court of Appeals is not in error. This case requires only the application of the principles established in *Raine v. Drasin,* Ky., 621 S.W.2d 895 (1981) to the facts.

This is a particularly fact-oriented situation. It involves the investigation of alleged child abuse, the execution of an emergency custody order and the efforts of the child's mother to recover the child as well as the conduct of her *pro bono* attorney. The mother was not served with a copy of the emergency custody order but was subsequently notified to attend a hearing in district court. She did not attend the first hearing or the rescheduled hearing. She did meet with the social workers to develop a treatment plan designed to assist her in regaining custody. On August 13, the mother appeared and informed the district court that she had retained a legal aid attorney. She discharged that attorney soon thereafter and contacted private attorney Prewitt. She gave Prewitt a variety of papers she had received from the Department of Social Services, but she did not have a copy of the custody order. Prewitt testified that he did not read any of the "bureacratic junk" given to him by the mother. He sent the mother to the courthouse to obtain any orders signed by the district judge. She was told the file was confidential and that it contained no orders signed by the judge. Prewitt then went to the courthouse and was also denied access to the file without an order from the district judge. When he asked what was in the file signed by the judge, he was advised

"nothing." He then went to the office of social services and was unable to speak with Ratliff who was out of the office. Prewitt refused to leave his name, wait or schedule an appointment.

At trial, Attorney Prewitt testified that he did not think it was worth his time to go to Morehead where the district judge was sitting in an attempt to obtain an order allowing access to the record. There is no evidence that he made any further attempts to investigate the situation, but instead, on September 6, prepared and filed a one paragraph petition for a writ of habeas corpus and a complaint seeking damages for violation of the mother's civil rights. At a hearing on a motion to dismiss, Prewitt was shown a copy of the emergency custody order, and he immediately moved for a voluntary dismissal which was subsequently granted. Thereafter, Sexton and Ratliff sued Prewitt for malicious prosecution. The basic elements to maintain such an action are described in *Raine v. Drasin, supra.*

At the time he filed the suit, Prewitt knew that the infant was in the custody of the Cabinet for Human Resources. He also knew that proceedings had been scheduled for a district judge in Bath District Court and that his client had appeared before the district judge and had been told to tell her lawyer to call the county attorney to schedule a hearing on the matter. He had been provided with numerous reports and summaries by the social workers regarding the juvenile proceedings and the emergency custody orders but he did not read the reports. He made no effort to obtain information about the case from the county attorney either by telephone or correspondence and his efforts to obtain information from the social workers was limited to stopping at their offices during lunch time, unannounced, without identifying himself and demanding to see the file. The office receptionist was correct in view of K.R.S. 199.335(9) and K.R.S. 194.060 in refusing to allow Prewitt to examine the records at that time. *Raine* establishes that an attorney has an obligation to make a reasonable investigation of the facts and law prior to filing suit, and that such fail-

ure is material to the question of probable cause in a malicious prosecution action.

The confidentiality of juvenile records at the time of this action was controlled by the old juvenile code, K.R.S. 208.030 and K.R.S. 208.060(1). The new juvenile code specifically provides that all juvenile court records are confidential. K.R.S. 610.340(1). This question has little significance in this case because neither Sexton nor Ratliff was responsible for the attorney's failure to obtain the records he requested from the district court clerk.

The attorney admits that the purpose of bringing the initial suit against the social workers was to "attract their attention and force them to come to us."

The fact that counsel was in a *"pro bono"* matter is not an excuse for his failure to make a sufficient investigation of the facts and law to establish probable cause prior to filing any suit. The practice of law is a profession and the fact that an attorney accepts a case without the expectation of receiving a fee does not excuse his conduct.

Clearly the award of damages is very high. But the evidence indicates that the attorney decided it would be cheaper to file the habeas corpus-civil rights action and to wait for the social workers to come to him than to drive to Rowan County, call the county attorney or otherwise get an order from the district judge permitting him to examine the file. The majority may be correct in indicating that there is a more appropriate relief against attorneys for the victims of groundless lawsuit by the use of Civil Rule 11 or a motion for relief under Civil Rule 73. However, the choice of forum and style of action still resides in the plaintiff. Here the plaintiff chose malicious prosecution, and I do not believe this Court can second guess that choice. I would affirm the jury verdict and the decision of the Court of Appeals.